PRESENT: All the Justices

A.H., A MINOR, BY HER NEXT FRIENDS, C.H. AND E.H.

                                                              OPINION BY
v. Record No. 180520                          JUSTICE D. ARTHUR KELSEY
                                                              AUGUST 15, 2019
CHURCH OF GOD IN CHRIST, INC., ET AL.

FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
William N. Alexander, II, Judge

Don Billups, a church deacon and youth leader, was convicted of sexually abusing

minors over the span of several years. He received two life sentences plus an additional term of

75 years in prison. One of the victims, A.H., filed this civil suit against (1) Don Billups; (2) his

wife, Donna Billups; (3) the local church, Gospel Tabernacle Church of God in Christ ("Gospel

Tabernacle"); and (4) the national denomination, Church of God in Christ, Inc. ("COGIC").

Among other allegations, A.H. claimed that the local church and the national denomination

(collectively, the "church defendants") had known of a prior sexual-abuse allegation against Don

Billups and had done nothing to warn or protect her.

The circuit court granted the church defendants' demurrers and dismissed A.H.'s

amended complaint with prejudice. On appeal, A.H. contends that her factual allegations, if

presumed true, state legally viable claims against the church defendants and, thus, that her case

should not have been dismissed on demurrer. Finding two of her arguments persuasive, we

reverse in part and affirm in part.

I.

A.

"Because this appeal arises from the grant of a demurrer, we accept as true all factual

allegations expressly pleaded in the complaint and interpret those allegations in the light most

favorable to the plaintiff." *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018). "To

1

survive a challenge by demurrer," however, factual allegations "must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment.'" *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 514 (2014) (citation omitted).[1] A plaintiff may rely upon inferences to satisfy this requirement, but only "to the extent that they are *reasonable*." *Coward*, 295 Va. at 358-59 (emphasis in original). Distinguishing between reasonable and unreasonable inferences is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), guided by the principle that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

B.

A.H. filed an initial complaint, and, with leave of court, an amended complaint against all four defendants. The circuit court granted the demurrers of Donna Billups and the church defendants and dismissed the claims against them with prejudice. In response, A.H. nonsuited her claims against Don Billups and appealed the circuit court's dismissal of her claims against the other defendants. We awarded A.H. an appeal only to address her claims against the church defendants. Our recitation of the facts, of course, restates only factual allegations that, even if

---

[1] The "sufficient definiteness" requirement has long anchored our application of notice-pleading principles. *See* Martin P. Burks, Common Law and Statutory Pleading and Practice § 182, at 295 (T. Munford Boyd ed., 4th ed. 1952); *see also Rafalko v. Georgiadis*, 290 Va. 384, 396 (2015); *Friends of the Rappahannock v. Caroline Cty. Bd. of Supervisors*, 286 Va. 38, 44 (2013); *Livingston v. Virginia Dep't of Transp.*, 284 Va. 140, 150 (2012); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 558 (2011); *Kitchen v. City of Newport News*, 275 Va. 378, 385 (2008); *Mark Five Constr., Inc. v. Castle Contractors*, 274 Va. 283, 287-88 (2007); *Eagle Harbor, L.L.C. v. Isle of Wight Cty.*, 271 Va. 603, 611 (2006); *Hubbard v. Dresser, Inc.*, 271 Va. 117, 122 (2006); *Moore v. Jefferson Hosp., Inc.*, 208 Va. 438, 440 (1967). There will always be a tension between a pleader's duty to state succinctly the "essential facts" supporting his claim, Rule 1:4(j), and the absence of any need to detail "the particulars" of a negligence claim, Rule 3:18(b). As decades of adjudicated cases show, however, the line between the two can only be fairly drawn on a case-by-case basis that focuses on which factual allegations are truly essential and which are inessential particulars.

plausibly pleaded, are as yet wholly untested by the adversarial process.

### 1. *The Relationships Among the Parties*

In her 35-page amended complaint, A.H. alleges that Gospel Tabernacle "at all times relevant to this action was owned, operated, managed, and/or otherwise controlled by" COGIC. J.A. at 45; *see also id.* at 46 (alleging that Gospel Tabernacle "has assumed the vows of membership in" COGIC); *id.* at 60 (alleging that COGIC "negligently supervised" Gospel Tabernacle). Gospel Tabernacle, "[a]s a local church," "is a part of the basic unit of the structural organization" of COGIC, with the former being "governed" by the latter's "Jurisdictional bishops" and "rules and regulations." *Id.* at 46. Gospel Tabernacle is "required to follow" COGIC's "Charter, Constitution, Laws and Doctrines." *Id.* Given this relationship, A.H. alleges, Gospel Tabernacle "was an agent" of COGIC. *Id.* at 47.

In his capacity as a church "Deacon, Youth Leader and Drill Team Coach," Don Billups[2] served "as an employee and/or agent"[3] of the church defendants. *Id.* at 50; *see also id.* at 48 (alleging that "Don Billups acted within the actual or apparent authority of" the church defendants, "who held out that [he] was a person appropriate to coach a drill team and work

---

[2] The amended complaint alternatively identifies this defendant as "Don" and "Donald" Billups. For consistency, we will refer to him as "Don Billups."

[3] The amended complaint repeatedly uses the phrase "and/or" when referring to Don Billups's relationship with the church defendants. *See* J.A. at 48, 53-54, 75-76. In other paragraphs of her amended complaint, however, A.H. at least impliedly alleges, without qualification, that Don Billups was an employee of the church defendants. *See id.* at 48, 60, 62. Her amended complaint also contains, at least impliedly, separate, unqualified allegations that Don Billups was an agent of the church defendants. *See id.* at 48, 75-76. We share the view that "and/or" is an "unfortunate hybrid" and "a drafting blemish" because "[t]he literal sense of and/or is 'both or either,'" providing three possible choices: one, the other, or both. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 125 (2012). We need not address the effect of this drafting ambiguity upon our demurrer analysis, however, because of A.H.'s separate, unqualified allegations of employment and agency.

within the Youth Department and as a Deacon"); *id.* at 49 (alleging that, "[a]t all relevant times to this action, Defendant Don Billups was an agent or employee of" the church defendants and "was acting within the scope of his agency or employment").[4]

Donna Billups served as a "licensed missionary" for the church defendants and was responsible for, among other things, "child evangelism." *Id.* at 47-48 (emphasis omitted). As part of her child-evangelism responsibilities, she "assisted" her husband in coaching Gospel Tabernacle's drill team by "provid[ing] rides to children." *Id.* While serving in these capacities, Don and Donna Billups "were agents and/or employees acting within the scope of their agency or employment with" the church defendants. *Id.* at 48; *see also id.* at 49, 75.

Both church defendants "selected, hired, employed, retained and supervised" Don and Donna Billups. *Id.* at 48. "At all relevant times, the Drill Team and Youth Department were subject to the direct control and supervision of" Gospel Tabernacle "and/or" COGIC. *Id.* at 49. Both Don and Donna Billups "actively recruited" young people for the drill team "during church services" through announcements and other means. *Id.* at 50. The church defendants held Don and Donna Billups "out to their congregants and the community as their agents." *Id.* at 75.

### 2. *The 2003 Sexual-Abuse Allegation*

In 2003, a 13-year-old girl reported that Don Billups had sexually abused her in 2002. Testifying at Don Billups's criminal trial in 2012, Donna Billups "admitted . . . that she was aware of accusations of the victim who came forward in 2003 and that she was 'aware of it when she [the victim] made it.'" *Id.* at 52 (alteration in original). Donna Billups testified at a bond

---

[4] The amended complaint states at the beginning of each of its multiple sections: "Plaintiff incorporates herein by reference all the allegations contained in the above paragraphs and throughout this entire Complaint as though the same were fully set forth herein at length." J.A. at 45, 58, 65, 70, 71-73, 75-76. Therefore, there are no factual allegations specifically applicable to one as opposed to another of the various counts in the amended complaint.

hearing that, despite this knowledge, she had told her husband only that "he needs to ah, be more careful." *Id.* at 51. She "continued to allow children to be in [his] presence" and "admitted" that Don Billups had continued to "entertain[] children in her house on a regular basis, including on occasions when her daughters were not there." *Id.* She was aware that Don Billups had "made no change in his lifestyle and didn't try to stay away from young girls, be more careful, or not hang out with teenagers." *Id.* "Don was just being Don," she said, "Don was just doing Don." *Id.*

Prior to the sexual abuse of A.H. (which occurred from 2006 to 2010), Gospel Tabernacle "and/or" COGIC "became aware of" the "allegations of sexual abuse that Defendant Donald Billups committed in 2002 as the result of a criminal and/or social services investigation." *Id.* at 52. Despite this knowledge, the church defendants "took no action" and "continued to permit Donald Billups to have access to children as well [as] privileges and duties as a church member, Deacon, Youth Leader and Drill Team Coach, without any restrictions at all, thus sanctioning and ratifying his conduct." *Id.* at 53. The church defendants did nothing even though they "knew or should have known of Don Billups'[s] propensities to commit harmful acts upon children," *id.* at 58.

### 3. *The Sexual Abuse of A.H. and the Criminal Trial*

"For the alleged purpose of furthering his assigned duties" on behalf of the church defendants, Don Billups "sought and gained the trust and friendship of Plaintiff A.H. and other children he similarly met through the church and their families." *Id.* at 53. The church defendants "knew or should have known that" A.H. visited the Billups residence "in conjunction with Drill Team activities and would otherwise engage in activities alone with Defendant Don Billups." *Id.*; *see also id.* at 59 (alleging that "Don Billups gained access to Plaintiff A.H. due to the negligence and recklessness of" the church defendants). Having held Don Billups out as

5

their agent, the church defendants "voluntarily took the custody of the minor plaintiff and subjected her to an association with Donald Billups, a person likely to harm her and therefore owed a duty to exercise reasonable care to plaintiff to prevent her from being exposed to an unreasonable risk of harm," *id.* at 53.

"Between 2006 and 2010," the amended complaint alleges, Don Billups sexually abused A.H. and other minors "at his home in the course of performing duties that were within the scope of his employment and/or agency with" the church defendants. *Id.* at 53-54. During this period, A.H. was between the ages of four and eight years old. Don Billups committed the abuse while "in execution of the services for which he was employed to perform by those same Defendants, namely as a Deacon, Youth Leader and/or Drill Team Coach." *Id.* at 54; *see also id.* at 48 ("At all relevant times to this action, [the church defendants] selected, hired, employed, retained and supervised Defendants [Don and Donna Billups] who were agents and/or employees acting within the scope of their agency or employment . . . ."); *id.* at 48-49 (alleging that Don and Donna Billups "acted within the actual or apparent authority" of the church defendants); *id.* at 76 (alleging that Don and Donna Billups committed tortious acts "during services that were within the ordinary course" of the church defendants' "business").

"In the Fall of 2011," the church defendants "once again became aware of additional allegations" of sexual abuse by Don Billups "of multiple other children he [had] met through the church." *Id.* at 56. The pastor of Gospel Tabernacle "and/or" COGIC met with one of the new victims and her family, along with Don and Donna Billups, to address the issue. *Id.* Following the meeting, neither of the church defendants reported the sexual-abuse allegations to law enforcement authorities but instead "continued to permit Donald Billups to have access to children and privileges and duties as a church member, Deacon, Youth Leader and Drill Team Coach, without restrictions at all, thus sanctioning and ratifying his conduct." *Id.* at 56-57.

6

In 2013, Don Billups was convicted "of sixteen (16) sex crimes involving minors, including Plaintiff A.H." *Id.* at 57. With respect to A.H., he "was charged and found guilty of object sexual penetration, aggravated sexual battery and taking indecent liberties." *Id.* The court imposed upon him two life sentences plus an additional term of 75 years in prison.

### 4. *The Claims Against the Church Defendants*

The amended complaint asserts various causes of action specifically against the church defendants. Count I alleges several theories of negligence liability. Count III asserts a claim for negligent infliction of emotional distress. Count VIII seeks to impose vicarious liability on the church defendants under the doctrine of respondeat superior. Finally, Count IX seeks an award of punitive damages. The circuit court dismissed each of these counts, and A.H. appealed.

## II.

"The facts alleged," the circuit court held, "do not establish a cause of action against" the church defendants. *Id.* at 243. Because the court did not elaborate further, we will address each of A.H.'s theories of recovery separately and then determine, to the extent that any survive demurrer, whether they warrant a demand for punitive damages.

### A. ASSUMED & SPECIAL-RELATIONSHIP DUTIES

Don Billups, not the church defendants, sexually abused A.H. The church defendants, therefore, can be directly (as opposed to vicariously) liable only if they owed a duty to protect A.H. from this abuse. "As a general rule, there is no duty to warn or protect against acts of criminal assault by third parties. This is so because under 'ordinary circumstances, acts of assaultive criminal behavior by third persons cannot reasonably be foreseen.'" *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 135 (2018) (quoting *A.H. v. Rockingham Publ'g Co.*, 255 Va. 216, 222 (1998)). "Indeed, 'in only rare circumstances has this Court determined that the duty to protect against harm from third party criminal acts exists.'" *Id.* (alteration omitted) (quoting

7

*Commonwealth v. Peterson*, 286 Va. 349, 359 (2013)).[5]

### 1. *The Two "Rare Circumstances"*

Two such rare circumstances exist that constitute exceptions to this general rule of non-liability. The first involves a defendant who expressly assumes a duty to protect another from criminal harm. *See Burns v. Gagnon*, 283 Va. 657, 672-73 (2012); *Kellermann v. McDonough*, 278 Va. 478, 488-90 (2009); *Didato v. Strehler*, 262 Va. 617, 627-29 (2001); *Morris v. Peyton*, 148 Va. 812, 823-24 (1927); *Karabalis v. E.I. Dupont de Nemours & Co.*, 129 Va. 151, 174 (1921).[6] Such a duty is not inferred merely because the defendant "'took precautions not required of it' to protect the safety of the plaintiff." *Terry*, 296 Va. at 137 (citation omitted)

---

[5] In the special-relationship context, our cases sometimes speak disjunctively of the duty to warn or to protect. *See, e.g.*, *Terry*, 296 Va. at 135-41 ("warn or protect"); *Peterson*, 286 Va. at 356 (same); *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 322 (2006) ("to warn or to protect"), *aff'd on reh'g*, 273 Va. 269 (2007); *Thompson ex rel. Thompson v. Skate Am., Inc.*, 261 Va. 121, 129 (2001) ("to warn and/or protect"); *Yuzefovsky v. St. John's Wood Apts.*, 261 Va. 97, 107 (2001) (same); *A.H.*, 255 Va. at 220 ("protect or warn"). Other times we refer simply to a duty to protect. *See, e.g.*, *Burns v. Gagnon*, 283 Va. 657, 668-71 (2012); *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 132-33 (2000); *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 136-37 (1999); *Burdette v. Marks*, 244 Va. 309, 311-13 (1992); *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 157-60 (1974).

The overarching duty is to exercise reasonable care. *See generally* William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 56, at 385 (Dan B. Dobbs et al. eds., 5th ed. 1984) ("In all such cases where the duty does exist, the obligation is not an absolute one to insure the plaintiff's safety, but requires only that the defendant exercise reasonable care. There is thus no liability when such care has in fact been used, nor where the defendant neither knows nor has reason to foresee the danger or otherwise to know that precautions are called for." (footnotes omitted)). Sometimes a warning may be enough to satisfy the standard of reasonable care, while other times it may not. When reasonable individuals could disagree on whether a warning alone was sufficient to mitigate the risk or whether stronger protective measures were warranted, the question belongs solely to the finder of fact.

[6] *See generally* Restatement (Second) of Torts §§ 323, 324A (1965); Restatement of Torts §§ 323, 325 (1934); 2 Dobbs et al., The Law of Torts §§ 410-12, at 669-95 (2d ed. 2011 & Supp. 2019); Charles E. Friend, Personal Injury Law in Virginia § 2.8, at 15-16 (3d ed. Supp. 2018); Prosser & Keeton, *supra* note 5, § 56, at 378-82; Kent Sinclair, Sinclair on Virginia Remedies § 25-8, at 25-64 to -66 (5th ed. 2016); 13 Peter Nash Swisher et al., Virginia Practice Series: Tort and Personal Injury Law § 3:10, at 75-76 (2018-2019 ed.).

(quoting *A.H.*, 255 Va. at 223).  The judicial "creation of a duty under these circumstances would discourage other parties from taking extra precautions to avoid being subjected to a liability which they otherwise would not have had."  *Id.* at 138 (citation omitted).  To find such an assumed duty to protect, an action greater than an "implied undertaking" based merely upon "voluntary conduct" is necessary.  *Id.* at 138-40.  Instead, an action tantamount to an "express communication" of a "specifically described undertaking" is required to conclude that a defendant has assumed a legal duty to protect another from a criminal assault.  *Id.* at 140.

The second rare exception to the general rule involves a duty not assumed but imposed.  The common law recognizes a duty to protect when a special relationship exists "(1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives a right to protection to the plaintiff."  *Brown v. Jacobs*, 289 Va. 209, 215 (2015) (alteration and citation omitted); *Burns*, 283 Va. at 668-69 (citation omitted); *Commonwealth v. Burns*, 273 Va. 14, 18 (2007) (citation omitted); *Burdette v. Marks*, 244 Va. 309, 312 (1992).[7]  The duty is not absolute, however.  It only exists when the defendant could have foreseen the need "to take affirmative action to protect [the plaintiff] from harm."  *Burns*, 283 Va. at 669 (citation omitted).

The degree of foreseeability required "depends on the nature of the special relationship" because "[w]e have recognized two levels of foreseeable harm."  *Peterson*, 286 Va. at 357; *see,*

---

[7] *See also Peterson*, 286 Va. at 356; *Kellermann*, 278 Va. at 492; *Taboada*, 271 Va. at 322-23; *Didato*, 262 Va. at 629-30; *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 276 (1991); *Marshall v. Winston*, 239 Va. 315, 318 (1990); *Fox v. Custis*, 236 Va. 69, 74 (1988); Friend, *supra* note 6, § 2.6(A)(1), at 30 (3d ed. 2003 & Supp. 2018); 1 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 25.02[1][a], at 25-7 (3d ed. 2017); Sinclair, *supra* note 6, § 25-8, at 25-57 to -58; *id.* § 27-3, at 27-42 to -43; 13 Swisher et al., *supra* note 6, § 3:10, at 75-77.  *See generally* Restatement (Second) of Torts § 302B & cmt. e; *id.* § 314 cmts. a & c; *id.* §§ 314A-315; Restatement of Torts § 315; 2 Dobbs et al., *supra* note 6, §§ 408, 413, 415, at 662-66, 697-700, 708-09 (2d ed. 2011 & Supp. 2019).

9

*e.g.*, *Wright v. Webb*, 234 Va. 527, 532 (1987) ("[A] business invitee does not entrust his safety to a business invitor to the same extent a passenger does to a common carrier."). *See generally K.L. ex rel. Lawson v. Jenkins*, Record No. 130786, 2014 WL 11398624, at \*1 n.1 (May 9, 2014) (unpublished) (describing the two levels of foreseeability); Sinclair, *supra* note 6, § 25-8, at 25-62 to -63 (same).

For example, a special relationship exists between a business owner and an invitee. *See Terry*, 296 Va. at 136 n.3.[8] In that scenario, the duty to protect exists "only when there [is] an imminent probability of injury from a third party act." *Id.* (citing *Wright*, 234 Va. at 533); *see* 2 Dobbs et al., *supra* note 6, § 416, at 711 & n.11 (2d ed. 2011) (placing Virginia among jurisdictions that "continue to limit liability to such cases of imminent harm, and to those in which the defendant's method of doing business attracts crime").

On the other hand, a special relationship also exists between an innkeeper and a guest, a common carrier and a passenger, and an employer and an employee. *See Terry*, 296 Va. at 136 n.3. The duty to protect in these contexts arises if the danger is either "known or reasonably foreseeable" to the defendant. *Id.* (citing *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 325-26 (2006) (innkeeper-guest), *aff'd on reh'g*, 273 Va. 269 (2007); *A.H.*, 255 Va. at 220 (employer-

---

[8] In *Terry*, we cited *Yuzefovsky*, 261 Va. at 109, as recognizing a special relationship between a landlord and a tenant. *See Terry*, 296 Va. at 136 n.3. To be clear, however, *Yuzefovsky* merely "[a]ssum[ed], without deciding," that the tenant had established "a special relationship between" himself and the landlord after observing that "in our prior landlord-tenant cases we found no special relationship" in the landlord-tenant context. 261 Va. at 108-09. We have never found such a special relationship to exist. *See* 8 Jerome P. Friedlander, II, Virginia Practice Series: Landlord-Tenant Handbook § 10:10, at 348 (2018-2019 ed.) ("The underlying principle is that there is no special relationship between landlord and tenant."). *See generally* Robert S. Schoshinski, American Law of Landlord and Tenant § 4:14, at 216 (1980) ("Traditionally the law has not imposed a special duty on landlords with respect to the physical security of tenants. . . . As a result, the traditional view has been that the landlord is not required to take measures to protect the tenant from criminal acts of third parties absent a contract or statute imposing the duty.").

employee); *Connell v. Chesapeake & Ohio Ry.*, 93 Va. 44, 62 (1896) (common carrier-passenger)); *see* 2 Dobbs et al., *supra* note 6, § 416, at 712 & n.19 (2d ed. 2011). In no scenario, however, does the special-relationship doctrine impose anything akin to strict liability, and thus, even when applicable, the doctrine "does not make the defendant an insurer of the plaintiff's safety," *Taboada*, 271 Va. at 323.[9]

The employer-employee relationship involves additional qualifications. In *A.H.*, we recognized a special relationship between an employer and an employee "with regard to the employer's potential duty of protecting or warning an employee." 255 Va. at 220 (citing Restatement (Second) of Torts § 302B cmt. e(B) (1965)). Focusing our analysis on the facts of that case, we addressed this duty only in the context of protecting an employee from a third party's intentional or criminal acts, not from a third party's negligence — as our reliance on a Restatement provision with this limited scope implies. *See* Restatement (Second) of Torts § 302B & cmt. e(B) (applying the duty to protect an employee only in the context of intentional or criminal conduct of a third party).

Though we have recognized a limited special-relationship duty on the part of an employer to protect an employee against a third party's intentional or criminal conduct, we have

---

[9] *See A.H.*, 255 Va. at 220-21 ("Where the duty does exist arising from a requisite relationship, the obligation is not an absolute one to insure the plaintiff's safety; there is no liability where the defendant neither knows nor has reason to foresee the danger or otherwise to know that precautions are called for." (quoting Prosser & Keeton, *supra* note 5, § 56, at 385)); *see also Dudas v. Glenwood Golf Club, Inc.*, 261 Va. 133, 138, 141 (2001) (reiterating our refusal to find "an absolute duty of the business invitor to protect its invitees from criminal assaults by unknown third parties on its premises" and finding that the golf club "was not an insurer of [the plaintiff's] safety"); *Yuzefovsky*, 261 Va. at 108 (reiterating that "the landlord is not an insurer of his tenant's safety"); *Delk*, 259 Va. at 133 (restating the standard from *A.H.*); *Gulf Reston, Inc.*, 215 Va. at 157-60 (finding no special relationship between a landlord and a tenant and stating that to impose a duty to protect a tenant from criminal acts of third parties based on "some risk of injury" alone "would make the landlord an insurer of his tenant's safety"); Restatement of Torts § 348 cmts. b-c (stating that a business owner is not an insurer of his patrons' safety against the harmful acts of third persons).

11

not to date recognized the inverse: a special-relationship duty on the part of the employer to control his employee so as to prevent the employee from harming third parties. We are aware that Restatement (Second) of Torts § 317 describes a duty on the part of an employer to control his employee "to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them." Our precedent, however, has held that an employer has no general duty to supervise one employee to protect another employee from intentional or negligent acts. *See infra* at 21 (citing, inter alia, *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 235 Va. 55, 61 (1988)). It seems incongruent that an employer would owe a duty to third parties that he does not owe to his own employee — particularly given that the interests of third parties are protected under Virginia law by traditional respondeat superior principles and the torts of negligent hiring and negligent retention, *see infra* at 17-20, 24-26.

Virginia law does recognize, however, that a special relationship exists between a vulnerable individual in a custodial relationship and his or her custodian. That relationship, if proven, imposes a duty of reasonable care upon the custodian to protect the vulnerable individual in his custody. *See Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 132-36 (2000) (reversing a trial court's decision to sustain demurrers when the plaintiff had alleged that she required 24-hour supervision from a psychiatric hospital and that the hospital had also taken charge of and exercised control over her assailant);[10] *Doe v. Bruton Parish Church*, 42 Va. Cir.

---

[10] *See also Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974) (finding that "the relationship of school pupils and school authorities should call into play the well recognized duty in tort law that persons entrusted with children . . . have a special responsibility recognized by the common law to supervise their charges"); *Laska v. Anoka Cty.*, 696 N.W.2d 133, 140 (Minn. Ct. App. 2005) ("Because [a daycare helper] voluntarily accepted the custody and control of a group of vulnerable individuals [children] . . . we conclude that [she] did have a special relationship with [the child decedent]."); *C.J.C. v. Corporation of Catholic Bishop of Yakima*, 985 P.2d 262, 273-74 (Wash. 1999) (en banc) (finding "a special relationship between a church and the children of its congregation" as a matter of first impression because the activities of a

467, 472-73 (1997) (Lemons, J.) (recognizing that a special relationship exists when a minor is placed in the custody of a church childcare provider).[11] *See generally* Restatement (Second) of Torts § 320 & cmts. a-b & d (describing the duties arising when one individual "takes the custody of another"); Restatement of Torts § 320 & cmts. a-b & d (1934) (same); 2 Dobbs et al., *supra* note 6, § 418, at 727-34 (2d ed. 2011 & Supp. 2019) (discussing the duties attendant upon a custodial relationship); 3 Fowler V. Harper et al., Harper, James and Gray on Torts § 18.7, at 915-16 (3d ed. 2007) (same); Prosser & Keeton, *supra* note 5, § 56, at 376-77, 383 (describing the application of the special-relationship doctrine).[12]

### 2. *The Church Defendants & The Assumed Duty to Protect*

A.H.'s amended complaint asserts that the church defendants "expressly assumed a duty of supervision of church workers and activities in its sexual harassment/misconduct policy." J.A.

---

church "generate" relationships similar to others in the special-relationship context, including a custodial relationship similar to that between a school and its students); Restatement (Third) of Agency § 7.05 cmt. e (2006) ("In particular, relationships that expose young children to the risk of sexual abuse are ones in which a high degree of vulnerability may reasonably require measures of protection not necessary for persons who are older and better able to safeguard themselves."); 3 W. Cole Durham & Robert Smith, Religious Organizations and the Law § 25:54 (2017) ("Generally, the common law duty deriving from the 'special relationship' of the custodian and the ward allows an injury incurred by a child in the custody of a shelter institution or school to be remedied in common law tort action . . . .").

[11] In *Kellermann*, we found it unnecessary to declare that a special relationship had arisen between a child and her friend's parents when the child was staying overnight at her friend's house. *See* 278 Va. at 492. After holding that the parents had a common-law duty to supervise and care for the child and that one of the two parents had additionally and expressly assumed a duty to the child, "we perceive[d] of no reason to expand our jurisprudence regarding special relationships to include an adult who agrees to supervise and provide care to a minor." *Id.* The applicability of common-law and assumed duties under the unique facts of *Kellermann* made it unnecessary to further explicate the role and scope of the special-relationship doctrine in that case. We find it necessary to do so in this case, however.

[12] We acknowledge that these authorities imply that the custodian has a duty to control the conduct of third parties to prevent harm to the ward from negligent as well as intentional and criminal acts. We need not address the issue of negligent acts here, and we limit our recognition of this duty to the context of the intentional, criminal acts alleged in the amended complaint.

13

at 47. In reviewing this assertion, however, we must "distinguish allegations of historical fact from conclusions of law. We assume the former to be true *arguendo*, but we assume nothing about the correctness of the latter because 'we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences.'" *Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 371 (2018) (emphasis in original) (citation omitted). The point is particularly important here because the ultimate question "[w]hether a legal duty in tort exists is a pure question of law to be reviewed de novo," *Brown*, 289 Va. at 215 (citation omitted).

We cannot accept A.H.'s conclusion of law — that the church defendants assumed a legal duty to protect her — because her factual allegations do not assert that these defendants made any clear communication to her of a "specifically described undertaking" to do so, *Terry*, 296 Va. at 140. At best, A.H. merely alleges that these defendants "'took precautions not required of [them]' to protect the safety of the plaintiff." *Id.* at 137 (quoting *A.H.*, 255 Va. at 223). And the sole precaution identified in the amended complaint is the church defendants' internal "sexual harassment/misconduct policy," J.A. at 47, which A.H. further alleges was never "disseminate[d] . . . to the membership family of COGIC," *id.* at 63.

An assumed duty to protect cannot be predicated solely upon an uncommunicated "implied undertaking" that is itself based entirely upon "voluntary conduct." *Terry*, 296 Va. at 138-40. Instead, there must be a clear expression of intent by a defendant to take on a legal duty to protect a plaintiff who is justifiably relying upon that clearly expressed intent. It is not reasonable to infer such intent merely from a defendant's adoption of an internal sexual harassment and misconduct policy. If merely creating such a policy were enough, standing alone, to impose legal liability where none previously existed, the law would provide a disincentive for employers to adopt and implement such policies.

14

### 3. *The Church Defendants & The Special-Relationship Doctrine*

A.H. claims that the church defendants "voluntarily took the custody of the minor plaintiff and subjected her to an association with Donald Billups, a person likely to harm her, and therefore owed a duty to exercise reasonable care to plaintiff to prevent her from being exposed to an unreasonable risk of harm." J.A. at 53. According to A.H., it was while she was in the custody of the church defendants that Don Billups sexually abused her — an outcome that the church defendants knew or should have known might occur based upon the earlier 2003 allegation of sexual abuse against him.

The sexual abuse occurred, A.H. alleges, at the Billups residence over the course of four years while A.H. was between the ages of four and eight years old. According to the amended complaint, the church defendants "knew or should have known that Plaintiff A.H. visited the Billups's residence in Covington, Virginia in conjunction with Drill Team activities and would otherwise engage in activities alone with Defendant Don Billups." *Id.* The amended complaint adds:

- The church defendants "actively recruited members and participants for Drill Team during church services and through bulletins, mass announcements, and other similar means." *Id.* at 50.

- The church defendants "held out that Donald Billups was a person appropriate to coach a drill team and work within the Youth Department and as a Deacon." *Id.* at 48.

- The church defendants "held Defendants Donna Billups and Don Billups out to their congregants and the community as their agents." *Id*. at 75.

- "At all relevant times, the Drill Team and Youth Department were subject to the direct control and supervision" of the church defendants. *Id.* at 49.

- "At all relevant times to this action, Defendant Don Billups was an agent or employee" of the church defendants and "at all

15

relevant times, was acting within the scope of his agency or employment with" the church defendants. *Id.*

- "Defendants voluntarily took the custody of the minor plaintiff and subjected her to an association with Donald Billups, a person likely to harm her and therefore owed a duty to exercise reasonable care to plaintiff . . . ." *Id.* at 53.

- "Between 2006 and 2010, when Plaintiff A.H. was a minor, Defendant Don Billups sexually abused her and others at his home in the course of performing duties that were within the scope of his employment and/or agency with [the church defendants] and in execution of the services for which he was employed to perform by those same Defendants, namely as a Deacon, Youth Leader and/or Drill Team Coach." *Id.* at 53-54.

- "Defendant Don Billups sexually abused children, including Plaintiff A.H., he had come into contact with and gained the trust and friendship of through his position as [the church defendants'] Deacon, Youth Leader and/or Drill Team coach." *Id.* at 54.

Based upon these allegations, A.H. claims that the church defendants breached their duty to her

> by failing to exercise reasonable care in the protection of Plaintiff A.H. from Defendant Don Billups whom Defendants knew or should have known was likely to cause bodily harm to others if not controlled, after having voluntarily undertaken custody and/or control of the child as part of the Drill Team and/or Youth Department.

*Id.* at 61.[13]

---

[13] Our colleague in dissent concludes that, as a matter of law, the church defendants could not reasonably have foreseen the need to protect A.H. from Don Billups. We respectfully disagree. The amended complaint alleges that in 2003, a 13-year-old girl "came forward" to disclose that Don Billups had sexually abused her in 2002. J.A. at 50. The church defendants, A.H. claims, "became aware" of these "allegations of sexual abuse . . . as the result of a criminal and/or social services investigation." *Id.* at 52. Despite this knowledge, the church defendants did nothing. They "took no action against Donald Billups to report such allegations to legal authorities and they continued to permit Donald Billups to have access to children . . . without any restrictions at all." *Id.* at 53. If the church defendants had responded reasonably to this knowledge, A.H. suggests, one could fairly infer that they would have discovered Don Billups's propensity to sexually abuse minors — the very predisposition that led to his conviction on 16 counts of sexual crimes against minors. At the pleading stage of this case, A.H.'s allegations that the church defendants did not act reasonably are sufficient to withstand demurrer.

16

We find these allegations sufficient to state a claim for negligence based upon a special-relationship duty of the church defendants to protect A.H., a minor, from sexual abuse by their alleged employee and agent, Don Billups, while she was in their custody.[14] The circuit court thus erred in finding these allegations insufficient to survive the church defendants' demurrers regarding the special-relationship theory of tort liability.

### B. NEGLIGENT HIRING, RETENTION, & SUPERVISION

A.H. also alleges that the church defendants negligently hired, retained, and supervised Don Billups as a deacon, youth leader, and drill team coach after receiving actual or constructive knowledge "of his propensities for improper sexual activity involving children and unfitness to have continued access to children." *Id..* at 60. "This Court has recognized the independent tort of negligent hiring" and "also has recognized the independent tort of negligent retention." *Southeast Apts. Mgmt., Inc. v. Jackman*, 257 Va. 256, 260 (1999). *See generally* Friend, *supra* note 6, §§ 26.1-.3, at 669-71 (3d ed. 2003); Sinclair, *supra* note 6, § 26-1, at 26-1 to -13. These torts involve claims of direct, not indirect, liability and are separate from respondeat superior claims. *See Parker v. Carilion Clinic*, 296 Va. 319, 348 n.15 (2018) (collecting cases and treatises); *J. v. Victory Tabernacle Baptist Church*, 236 Va. 206, 211 (1988).

### 1. *Negligent Hiring*

Liability for negligent hiring "is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk

---

[14] A.H. also alleges that the church defendants had a special relationship with Don Billups as their employee and agent, and thus, that they had a duty to control his conduct so as to protect her from harm. As noted earlier, *see supra* at 11-12, we have not recognized a special-relationship duty on the part of an employer to control the conduct of his employee toward third parties, and we decline A.H.'s invitation to do so in this case. We instead rest our holding on the special relationship alleged to have existed between her and the church defendants.

of harm to others" and on the employer's negligence "in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others." *Jackman*, 257 Va. at 260 (citation omitted); *see also Interim Pers. of Cent. Va., Inc. v. Messer*, 263 Va. 435, 440 (2002). "[T]he plaintiff must show that an employee's propensity to cause injury to others was either known or should have been discovered by reasonable investigation." *Majorana v. Crown Cent. Petroleum Corp.*, 260 Va. 521, 531 (2000); *see also* Friend, *supra* note 6, § 26.2, at 670 (3d ed. 2003); Sinclair, *supra* note 6, § 26-1[B], at 26-5.

In the present case, even assuming that A.H.'s allegations of Don Billups's employment and/or agency on behalf of the church defendants are true, A.H. does not allege that the church defendants knew or should have known of his alleged propensities to engage in sexual activity with minors when they hired him as a deacon, youth leader, and drill team coach. A.H. only alleges that the church defendants "knew or should have known of Don Billups'[s] propensities to commit harmful acts upon children," J.A. at 58, without alleging that the church defendants knew or should have known of such propensities when they employed Don Billups.

A.H. further alleges that Don Billups had been a deacon "[f]or at least fifteen (15) years" prior to her amended complaint (filed in 2015) and that Don Billups started the drill team "[s]ometime after becoming a deacon." *Id.* at 49. Her only specific allegation regarding the timing of the church defendants' actual or constructive knowledge is that, "[u]pon information and belief, prior to Defendant Donald Billups'[s] abuse of plaintiff A.H.," the church defendants, along with Donna Billups, "became aware of" the 2003 allegation through "a criminal and/or social services investigation." *Id.* at 52.

18

In other words, A.H.'s only allegation regarding the timing of the church defendants' knowledge is that the church defendants became aware of an allegation of sexual abuse that had occurred in 2002 sometime before the abuse of A.H. began in 2006. The amended complaint contains no allegations that, at the time the church defendants hired Don Billups as a deacon and later as a drill team coach, they knew or had any reason to know of any of his dangerous propensities. *Cf. Victory Tabernacle Baptist Church*, 236 Va. at 211 (reversing a grant of a demurrer in a "negligent hiring" case involving a church that hired a sex offender who later sexually abused a 10-year-old parishioner). The allegations fail to assert facts sufficient to state a claim for negligent hiring.

### 2. *Negligent Retention*

In Virginia, a claim for negligent retention exists "for harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm [others]." *Jackman*, 257 Va. at 260-61; *see also Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 269 (4th Cir. 2001) (applying Virginia law). The allegations and eventual proof must show that the employer was "negligent in failing to terminate," *Philip Morris Inc. v. Emerson*, 235 Va. 380, 401 (1988), the "dangerous employee," *Jackman*, 257 Va. at 260-61.[15]

---

[15] One of our early cases on the subject, *Norfolk Protestant Hospital v. Plunkett*, 162 Va. 151, 156 (1934), could be mistakenly read to suggest that the retention of an employee who was merely "[in]competent" could trigger, without more, negligent-retention liability. The factual context of that case, however, involved a distinguishable level of *dangerous* incompetence of a nurse who was untrained, lacking in "moral character," uneducated, "guilty of indiscretions that impair[ed] her physical or mental status," "repeatedly reprimanded," and "threatened with dismissal." *Id.* at 156. Despite these circumstances, the employer placed her "in charge of a helpless patient." *Id.*

The negligent-retention tort differs from the special-relationship theory of recovery because the former requires a showing that the risk of future harm was so grave that discharging the dangerous employee would have been the only reasonable response. The special-relationship duty to protect, if the facts were egregious enough, could warrant the same conclusion. But the duty to protect could also be satisfied upon a showing that lesser measures were equally reasonable in mitigating the risk of future harm.[16] Unlike the special-relationship theory of recovery, however, a prima facie case of negligent retention requires an amplified showing that both the nature and gravity of the risk render unreasonable any mitigating response short of termination.

We agree with the circuit court that the allegations in the amended complaint do not support the legal conclusion that the church defendants negligently retained Don Billups. The church defendants, according to A.H., knew of the 2003 sexual-abuse allegation against Don Billups. But the amended complaint does not assert any specifics about the allegation or how, if at all, any social services or law enforcement authorities resolved it. We do not believe that this prior allegation, given its vague description in the amended complaint and the absence of any assertion that the responsible authorities had verified it, was enough, standing alone, to trigger a legal duty to terminate Don Billups from any employment or agency relationship that he had with the church defendants. Because of this lack of specificity in the allegations, we hold that the circuit court correctly sustained the church defendants' demurrers with respect to the claim for negligent retention.

---

[16] A.H.'s amended complaint lists several such measures, including, for example, assigning Don Billups to church tasks that did not involve contact with minors, requiring a second adult to be present with him at all times while he was in the company of minors, or, alternatively, simply warning A.H. and her parents of the prior sexual-abuse allegation against Billups. *See* J.A. at 59-63.

### 3. *Negligent Supervision*

The circuit court also correctly held that A.H.'s claim for negligent supervision, as a free-standing cause of action, could not survive demurrer. "In Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances and we will not create one here." *Dowdy*, 235 Va. at 61; *see also Williams v. Shall*, Record No. 120889, 2013 Va. Unpub. LEXIS 1, at *3 (June 6, 2013) ("Virginia does not recognize a claim for negligent supervision."); *Eley v. Evans*, 476 F. Supp. 2d 531, 532 n.3 (E.D. Va. 2007) ("[F]ederal and Virginia courts have held that Virginia does not recognize negligent supervision as a valid cause of action."). A.H.'s allegations of negligence, therefore, cannot be predicated upon a stand-alone theory that the church defendants owed her a duty to supervise Don Billups.

### C. NEGLIGENCE PER SE

A.H. also alleges that the church defendants are liable for "negligence per se for violating Virginia's mandated reporting laws of child abuse" because they "fail[ed] to report suspected abuse after [they] knew and/or had reason to suspect, by and through their employees and/or agents, including Defendant Donna Billups, a licensed missionary, that Defendant Don Billups sexually assaulted children prior to his abuse of Plaintiff A.H." J.A. at 63. *See generally* Code §§ 63.2-100, -1508 to -1511. The circuit court correctly held that these allegations do not state a claim for negligence per se.

As we explained in *Parker*, negligence per se only exists "*where there is a common-law cause of action. The doctrine of negligence per se does not create a cause of action where one did not exist at common law.*" 296 Va. at 345 (emphases in original) (citation omitted). Put another way, the negligence per se "doctrine does not create a duty of care" but "merely sets a standard of care by which the defendant may be judged in the common-law action," and thus, "[t]he absence of an underlying common-law duty renders the presence of a statutory standard of

21

care irrelevant." *Id.*  *See generally* Sinclair, *supra* note 6, § 25-4[A], at 25-25 to -26.

A.H. alleges no common-law duty to report suspected child abuse.  Instead, she relies exclusively upon the Virginia reporting statutes as both creating the duty and setting the standard of care.  We have expressly rejected the proposition "that a statute setting a standard of care also creates the duty of care."  *Parker*, 296 Va. at 346 (citation omitted).  Without a common-law antecedent to the duty to report suspected child abuse, A.H.'s negligence per se claim against the church defendants cannot survive demurrer.

### D.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In this case, A.H.'s allegations of emotional injuries are subsumed within her special-relationship claim, *see supra* at 15-17, and her respondeat superior claim, *see infra* at 24-26, that we hold have been properly asserted.  A.H. may recover damages for emotional distress only in relation to these claims.  A negligence cause of action for emotional distress does not exist in the abstract:

> If everyone was allowed damages for injuries to his feelings caused by someone else, the chief business of mankind might be fighting each other in the courts.  Damages for mental suffering open into a field without boundaries, and there is no principle by which the court can limit the amount of damages.

*Ruth v. Fletcher*, 237 Va. 366, 372-73 (1989) (quoting *Bowles v. May*, 159 Va. 419, 433-34 (1932)).  While "a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm" has a long history in the common law, "no equivalent proposition ever has been adopted with respect to emotional harm.  Nor, given the ubiquity of emotional harms, is it likely to be."  2 Dobbs et al., *supra* note 6, § 390, at 571 (2d ed. 2011) (citation omitted).

It is thus with considerable caution that, on this subject, we "keep one eye on the theoretical, and the other on the practical."  *Bowles*, 159 Va. at 434 (citation omitted).  Both of these views require a showing of an underlying tort duty as the predicate for making a claim for

22

the negligent infliction of emotional distress. *See Gray v. INOVA Health Care Servs.*, 257 Va. 597, 599-600 (1999) (rejecting a claim for negligent infliction of emotional distress absent a showing that the defendant "owed a duty of care" to the plaintiff); *Chizmar v. Mackie*, 896 P.2d 196, 203 (Alaska 1995) ("[W]e believe that a plaintiff's right to recover emotional damages caused by mere negligence should be limited to those cases where the defendant owes the plaintiff a preexisting duty.").[17] *See generally* Sinclair, *supra* note 6, § 16-3, at 16-15 to -16.[18]

---

[17] S*ee also, e.g.*, *Jograj v. Enterprise Servs., LLC*, 270 F. Supp. 3d 10, 27 (D.D.C. 2017) ("Where a preexisting duty is breached, D.C. courts allow recovery for emotional injuries that arise from that breach."); *BK v. New Hampshire Dep't of Health & Human Servs.*, 814 F. Supp. 2d 59, 72 (D.N.H. 2011) ("There is no question that a claim for negligent infliction of emotional distress, like any other negligence claim, demands the existence of a duty from the defendant to the plaintiff."); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 807 (Cal. 1993) ("The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element."); *Burgess v. Superior Court*, 831 P.2d 1197, 1200 (Cal. 1992) (recognizing that "the negligent causing of emotional distress is not an independent tort" (alteration, emphasis, and citation omitted)); *English v. Griffith*, 99 P. 3d 90, 95 (Colo. App. 2004) ("The tort of negligent infliction of emotional distress is predicated upon . . . a legal duty of care owed to the plaintiff."); *Akers v. D.L. White Constr., Inc.*, 320 P.3d 428, 442 (Idaho 2014) ("[T]here must be a breach of a recognized legal duty in order to support a claim for negligent infliction of emotional distress." (citation omitted)); *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011) ("We have never permitted, nor do we today, an action seeking damages for emotional distress predicated upon a breach of an alleged duty not to inflict emotional injury on another."); *Doe v. Dunn*, 890 So. 2d 727, 730 (La. Ct. App. 2004) ("[T]here must be proof that the defendant violated some legal duty owed to the plaintiff . . . ."); *Ridings v. Maze*, 414 P.3d 835, 837 (Okla. 2018) (recognizing that "[t]he negligent causing of emotional distress is not an independent tort" ); *Blaha v. Stuard*, 640 N.W.2d 85, 90 (S.D. 2002) (recognizing that "[t]he first element" of a claim for negligent infliction of emotional distress is "the breach of a legal duty" (citation omitted)); *Boyles v. Kerr*, 855 S.W.2d 593, 596 (Tex. 1993) (holding that "mental anguish damages should be compensated only in connection with defendant's breach of some other duty imposed by law").

[18] The amended complaint does not assert a claim for intentional infliction of emotional distress against the church defendants. *See, e.g.*, *Almy v. Grisham*, 273 Va. 68, 77 (2007); *Womack v. Eldridge,* 215 Va. 338, 342 (1974). Unlike negligent infliction — which is best understood as a mere remedial theory governing recoverable damages — intentional infliction of emotional distress, when applicable, creates a stand-alone tort duty. Given this unique characteristic, the tort has a "disfavored status" in Virginia law for the reason that, "because the prohibited conduct cannot be defined objectively, clear guidance is lacking, both to those wishing to avoid committing the tort, and to those who must evaluate whether certain alleged conduct satisfies all elements of the tort." *Almy*, 273 Va. at 81.

This principle tracks the ancient concept, deeply embedded in Virginia law, that "[a]n action for negligence only lies where there has been a failure to perform some legal duty which the defendant owes to the party injured." *Balderson v. Robertson*, 203 Va. 484, 487 (1962) (quoting *Williamson v. Southern Ry.*, 104 Va. 146, 149 (1905)). "[T]here is no such thing as negligence in the abstract, or in general, or as sometimes is said, in vacuo." *Kent v. Miller*, 167 Va. 422, 425-26 (1937). This statement is true for negligent infliction of emotional distress no less than it is for negligent infliction of physical injury or death. To be sure, "[t]he question of liability for negligence cannot arise at all until it is established that the [person] who has been negligent owed some duty to the person who seeks to make him liable for his negligence." *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 277 (1991) (quoting *Le Lievre v. Gould* [1893] 1 Q.B. 491 at 497 (Eng.) (opinion of Esher, M.R.)).

In this case, A.H. may recover emotional-distress damages at trial only upon a showing that the defendants were negligent — which necessarily requires a showing of a breach of an underlying tort duty of care. In this case, we recognize that the amended complaint plausibly alleges facts supporting two such duties: the duty of care arising out of the special relationship of custodian and child, *see supra* at 15-17, and the duty of care vicariously imposed by the doctrine of respondeat superior, *see infra* at 24-26. A.H. may recover emotional-distress damages, if at all, only upon proof that the defendants breached one of these two duties.

E. VICARIOUS TORT LIABILITY: RESPONDEAT SUPERIOR

A.H. argues that her amended complaint states a prima facie case of vicarious liability against the church defendants under the doctrine of respondeat superior. We recently surveyed the law on this subject and reaffirmed that a rebuttable presumption that an employee was acting within the scope of his employment arises when the plaintiff alleges an employment relationship. *See Parker*, 296 Va. at 332-33. "This presumption shifts the burden of production to the

24

employer to present facts sufficient to permit the factfinder to conclude that the employee was not acting within the scope of his employment at the time of his tortious conduct" even though "[t]he burden of persuasion stays with the employee from the start." *Id.* at 333 n.6. This presumption applies at the outset of the case, "begin[ning] with the complaint, not the presentation of evidence at trial." *Id.* at 334.

We held in *Parker* that the plaintiff was entitled to this presumption because of her allegation of an employment relationship, but we reiterated that "the *service itself*, in which the tortious act was done," must be "within the ordinary course of the employer's business." *Id.* at 336 (emphasis in original) (alteration and citation omitted). Thus, the tortious act must occur "*while* the employee was in fact performing a *specific job-related service* for the employer" and must be "within the *scope of the duties* of the employment and in the execution of the *service* for which the employee was engaged." *Id.* at 338-39 (emphases in original) (citation omitted).

We reach the same conclusion here. A.H. alleges that Don Billups was an employee or agent of the church defendants. She is therefore entitled to the rebuttable presumption that he was acting within the scope of his employment when he sexually abused her. A.H. enhances that presumption by specifically alleging that Don Billups abused her "in the course of performing duties that were within the scope of his employment and/or agency with [the church defendants] and in execution of the services for which he was employed to perform by those same Defendants, namely as a Deacon, Youth Leader and/or Drill Team Coach." J.A. at 53-54; *see also id.* at 76 (alleging that the church defendants are vicariously liable for Don and Donna Billups's actions "committed during services that were within the ordinary course of [the church defendants'] business and Defendants Donna and Don Billups'[s] agency and/or employment"); *supra* at 3-6 (detailing other allegations that Don and Donna Billups were, at all relevant times, acting as employees or agents of the church defendants). We conclude that these allegations,

25

which we assume to be true, are sufficient to survive demurrer.[19]

## F. PUNITIVE DAMAGES

A.H. seeks punitive damages from the church defendants based upon all of her theories of liability. We agree with the circuit court that the amended complaint lacks sufficient factual allegations to justify a claim for punitive damages under any of these theories.

### 1. *Vicarious Tort Liability — Respondeat Superior*

In the respondeat superior context, "punitive damages cannot be awarded against a master or principal for the wrongful act of his servant or agent in which he did not participate, and which he did not authorize or ratify." *Egan v. Butler*, 290 Va. 62, 74 (2015) (citation omitted). In other words, "punitive damages may be awarded against a corporate employer only if either (1) that employer participated in the wrongful acts giving rise to the punitive damages, or (2) that employer authorized or ratified the wrongful acts giving rise to the punitive damages." *Id.*; 1 Friend & Sinclair, *supra* note 7, § 23.05[2], at 23-40; Sinclair, *supra* note 6, § 3-4[B], at 3-47 to -48; Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 3.2[F], at 40 (6th ed. Supp. 2018-2019).

---

[19] We have found certain allegations of sexual misconduct sufficient to state a claim for respondeat superior liability. *See Majorana*, 260 Va. at 527 (finding sufficient an allegation that a gas station attendant assaulted a customer "while he was performing the business of his employer for which she was the employer's customer" because the complaint alleged that the assault had occurred during a sales transaction); *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233, 237 (1996) (finding sufficient an allegation that a psychiatrist acted within the scope of his employment when he engaged in sexual relations with his patient "while he was performing his duties as a psychologist in the execution of the services for which he was employed"). In both cases, the plaintiffs alleged that the employee had committed the tortious act while in the very act of performing a job-related service. The difficulty of proving this assertion, however, is one of the reasons that "[p]laintiffs rarely succeed in their claims that a religious organization is vicariously liable for its agent's sexual misconduct," Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. Rev. 1789, 1880. *See generally* Joseph B. Conder, Annotation, *Liability of Church or Religious Society for Sexual Misconduct of Clergy*, 5 A.L.R. 5th 530, §§ 2[a], 3 (2019).

A.H. does not allege that the church defendants *participated in* or *authorized* the sexual abuse that she endured. She does, however, allege that the church defendants "ratified" Don Billups's conduct. J.A. at 59, 65, 77. She draws this conclusion from the allegation that the church defendants

> took no action against Donald Billups to report [the prior sexual abuse] allegations to legal authorities and they continued to permit Donald Billups to have access to children as well [as] privileges and duties as a church member, Deacon, Youth Leader and Drill Team Coach, without any restrictions at all, thus sanctioning and ratifying his conduct.

*Id.* at 53. She further alleges that the church defendants "acted wantonly, oppressively, or with such recklessness or negligence as evinced a conscious disregard of [her] rights . . . and/or with such malice as implied a spirt of mischief, or criminal indifference to civil obligations." *Id.* at 64.

Like the circuit court, we find these conclusory allegations to be lacking in "sufficient definiteness," *see supra* at 1-2 & n.1, to justify a claim for punitive damages. At best, A.H. alleges that the church defendants knew or should have known that Don Billups was likely to abuse her just as he had allegedly abused another child in 2002. Based upon that knowledge, A.H. concludes, the church defendants should have done something to protect her. As observed earlier, *see supra* at 15-17, that factual sequence may support A.H.'s claim that the church defendants breached a special-relationship duty to protect her. However, it is implausible to infer from her factual allegations that the church defendants acted in such a manner as to *ratify* the alleged sexual abuse. *See* Black's Law Dictionary 1513 (11th ed. 2019) (defining "ratification" as "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done," or, "[t]he affirmance of someone's prior act, whereby the act is

27

given the same effect as if it had been done by an agent acting with actual authority").[20]

Ratification implies approval, confirmation, and acceptance. No factual allegations in the amended complaint permit such an unreasonable inference.

## 2. *Direct Tort Liability — Special-Relationship Negligence*

We reach the same conclusion regarding A.H.'s request for punitive damages for the church defendants' alleged breach of their direct tort duties associated with her special-relationship theory of recovery. Under the common law, "[p]unitive or exemplary damages are allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." *Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan*, 269 Va. 421, 425 (2005) (quoting *Giant of Va., Inc. v. Pigg*, 207 Va. 679, 685 (1967)). "We have repeatedly stated that an award of punitive damages is not favored generally because punitive damages are in the nature of a penalty and should be awarded only in cases involving the most egregious conduct." *Bowers v. Westvaco Corp.*, 244 Va. 139, 150 (1992).[21] For this reason, "[w]here the act or omission complained of is free from fraud, malice, oppression, or other special motives of aggravation, damages by way of punishment cannot be awarded, and compensatory damages only are permissible." *Stephan*, 269 Va. at 425 (quoting *Wright v. Everett*, 197 Va. 608, 615 (1956)).[22]

---

[20] *See, e.g.*, *Southern Ry. v. Grubbs*, 115 Va. 876, 881 (1914) (describing the plaintiff's reliance on the railroad's failure to discharge a conductor as evidence of ratification as "not tenable" and stating that to hold that a railroad has ratified an employee's conduct merely because of its failure to discharge the employee would be a "harsh rule" for employees because it "would put their continued employment in jeopardy every time an accident occurred . . . because the railway company stood in danger that wantonness might be established" (citation omitted)).

[21] On this point, common-law claims for punitive damages — like those asserted in this case — must be distinguished from statutory claims for punitive damages. *See Cain v. Lee*, 290 Va. 129, 135 (2015).

[22] *See also PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 345 (2003); *Baker v. Marcus*, 201 Va. 905, 909 (1960); *Wood v. American Nat'l Bank*, 100 Va. 306, 316 (1902).

The amended complaint sufficiently pleads a negligence claim arising out of the special relationship between the church defendants and A.H., a minor in their custody. But the factual allegations supporting this claim do not support a reasonable inference that the church defendants' acts or omissions were "so willful or wanton as to evince a conscious disregard of the rights of others" or that the church defendants "consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result," *Bowers*, 244 Va. at 150 (citations omitted). Any conclusory allegations that the church defendants acted wantonly, oppressively, or with criminal indifference have no factual support, and we find them to be "strained, forced, [and] contrary to reason," *Sweely Holdings, LLC*, 296 Va. at 371 (citation omitted).

## III.

In sum, we reverse the circuit court's dismissal of A.H.'s claim asserting negligence based upon a special relationship between her and the church defendants. We also reverse the court's grant of the church defendants' demurrers to A.H.'s respondeat superior claim. If successful on either of these claims, A.H. may recover compensatory damages (including damages for emotional distress) but not punitive damages. We further hold that the circuit court properly dismissed A.H.'s claims for negligent hiring, retention, and supervision, as well her claim for negligent infliction of emotional distress as a stand-alone tort. Finally, we hold that the circuit court correctly dismissed her claims for punitive damages. We remand this case to the circuit court for further proceedings consistent with this opinion.[23]

---

[23] COGIC raises on appeal two additional arguments in support of the circuit court's decision to grant its demurrer: charitable immunity and constitutional immunity under the First Amendment. Both church defendants asserted these arguments as affirmative defenses in the circuit court. *See* J.A. at 101, 118. As affirmative defenses, these arguments may not be raised in a demurrer, which tests only the facial validity of the allegations in a complaint rather than the

*Reversed in part,*
*affirmed in part,*
*and remanded.*

JUSTICE McCLANAHAN, concurring in part and dissenting in part.

I concur in the Court's judgment that the circuit court properly dismissed the claims asserted in the amended complaint against Gospel Tabernacle Church of God in Christ and Church of God in Christ, Inc. (the "church defendants") for negligent hiring, retention, and supervision; negligent infliction of emotional distress; and punitive damages.

I believe the amended complaint states a legally viable claim against the church defendants based on the theory of respondeat superior, but not on the theory of a special custodial relationship. Therefore, I concur in the Court's judgment that the circuit court erred in dismissing the respondeat superior claim against the church defendants because, as the Court holds, the amended complaint alleges that Don Billups was an employee and/or agent of the church defendants and was acting within the scope of this employment and/or agency when he sexually abused A.H.[1]

---

validity of affirmative defenses. *See Duggin v. Adams*, 234 Va. 221, 229 (1987) ("Because the sole question in this appeal is whether the motion for judgment alleges a prima facie case . . . , we express no opinion respecting [defendant's] affirmative defense."); Durham & Smith, *supra* note 10, § 21:13 (describing First Amendment arguments "as a defense" to claims against religious organizations for sexual abuse); Sinclair, *supra* note 6, § 2-4[D][1], at 2-34 to -37 (describing charitable immunity as a defense that a defendant entity must prove); Sinclair & Middleditch, *supra*, § 2.32, at 202 (6th ed. 2014) (same). We therefore decline to address these arguments and confine our analysis to the demurrers to A.H.'s amended complaint.

[1] Specifically, the majority concludes that because "A.H. alleges that Don Billups was an employee or agent of the church defendants," she is entitled to the rebuttable presumption that he was acting within the scope of his employment when he sexually abused her and that "A.H. enhances that presumption by specifically alleging that Don Billups abused her 'in the course of performing duties that were within the scope of his employment and/or agency with [the church defendants].'"

30

I dissent, however, from the Court's judgment that the amended complaint alleges sufficient facts to state a claim for negligence against the church defendants based upon a special custodial relationship between A.H. and the church defendants. *First*, the amended complaint does not allege that A.H. was in the custody of the church defendants when she was sexually abused by Billups or allege sufficient facts to support such a contention even if it were made. *Second*, notwithstanding my position that the amended complaint fails to allege sufficient facts to support the existence of a special custodial relationship between A.H. and the church defendants when she was sexually abused by Billups, I believe it is unnecessary to reach that question because the facts alleged are insufficient to show that it was reasonably foreseeable to the church defendants that A.H. would be sexually abused by Billups.

I.

As the majority states, "Don Billups, not the church defendants, sexually abused A.H.," and "[a]s a general rule, there is no duty to warn or protect against acts of criminal assault by third parties." *See, e.g., Brown v. Jacobs*, 289 Va. 209, 215 (2015) ("Generally, 'a person does not have a duty to warn or protect another from the criminal acts of a third person.'") (quoting *Commonwealth v. Peterson*, 286 Va. 349, 356 (2013)). We have recognized, however, that "this general rule does not apply when a special relationship exists between a defendant and a plaintiff that gives rise to a right to protection to the plaintiff." *Kellermann v. McDonough*, 278 Va. 478, 492 (2009). "Some of the special relationships recognized by this Court include common carrier/passenger; innkeeper/guest; employer/employee; business owner/invitee; and hospital/patient." *Brown*, 289 Va. at 215.

Although the amended complaint asserts that a special relationship existed between the church defendants and A.H. premised upon their custody of her, it does not allege that A.H. was

31

in the custody of the church defendants when she was sexually abused by Billups.[2]  The

amended complaint does not allege that A.H. was on church premises when she was sexually

abused by Billups or that she was on premises owned or controlled by the church defendants

when she was sexually abused by Billups; rather, the amended complaint alleges that Billups

sexually abused her "at his home."  While the amended complaint alleges that all defendants

"voluntarily took the custody" of A.H. in general, and without any reference to time or place, it

does not allege that the church defendants took the custody of her when she was in Billups's

home and, in particular, when she was sexually abused by Billups in his home.

The amended complaint also does not allege facts supporting an inference that A.H.'s

parents relinquished their custody of her to the church defendants when she was sexually abused

by Billups in his home.  The amended complaint does not allege any facts describing how A.H.

came to be at the Billups residence at any time and, in particular, on the dates she was sexually

abused by Billups in his home.  The amended complaint does not allege any facts describing the

circumstances surrounding A.H.'s visits to the Billups residence, such as whether her parents or

any other adults were there, and in particular, any facts supporting an inference that she was

deprived by the church defendants of her normal means of protection on the dates she was

sexually abused by Billups in his home.

Furthermore, even if the amended complaint asserted that A.H. was in the custody of the

church defendants when she was sexually abused by Billups, or that A.H. was in the custody of

the church defendants when she was in Billups's home, it does not allege that the church

defendants authorized Billups to take A.H. into custody on the church defendants' behalf.  The

---

[2] The majority states that "[a]ccording to A.H., it was while she was in the custody of the church defendants that Don Billups sexually abused her."  This allegation, which is conclusory in itself, is actually not made in the amended complaint.

amended complaint does not allege that the church defendants authorized Billups to invite youth members into his home, and in particular, that the church defendants authorized him to invite youth members into his home without other adult supervision. Rather, the amended complaint alleges the church defendants "knew or should have known that [A.H.] visited the Billups' residence in Covington, Virginia in conjunction with Drill Team activities and would otherwise engage in activities alone with Defendant Don Billups." Even if the church defendants' alleged knowledge that A.H. "visited the Billups' residence . . . in conjunction with Drill Team activities" could constitute authority to invite youth members into his home, which it does not, the amended complaint does not allege when the church defendants allegedly came to know of such visits.

While the majority recites numerous allegations made in the amended complaint to support its conclusion that the amended complaint sufficiently alleges that a special custodial relationship existed between A.H. and the church defendants, none of these allegations asserts that A.H. was in the custody of the church defendants when she was sexually abused by Billups – proof of which should be required but is not even pled under the amended complaint. In my view, the allegations are wholly insufficient to support an assertion – which is not even made in the amended complaint – that A.H. was in the custody of the church defendants when she was sexually abused by Billups in his home. As this Court has recognized, "we are not bound to accept conclusory allegations in a review of a demurrer," *Ogunde v. Prison Health Servs.*, 274 Va. 55, 66 (2007), and we certainly should not rely upon allegations that are not made in the pleadings. Therefore, I do not believe that the amended complaint alleges sufficient facts to support the contention that a special custodial relationship existed between A.H. and the church defendants when A.H. was sexually abused by Billups.

33

II.

Although I do not believe the amended complaint alleges sufficient facts to establish that a special custodial relationship existed between the church defendants and A.H. when she was sexually abused by Billups, I also believe it is unnecessary to reach that question. Under the facts alleged in the amended complaint, the sexual abuse by Billups was not reasonably foreseeable by the church defendants as a matter of law.

The determination that a special custodial relationship exists between a defendant and plaintiff is not dispositive of the issue of whether the defendant owed a duty to protect the plaintiff from the criminal act of a third party because "the court must also conclude the defendant knows of the danger of an injury or has reason to foresee that danger before a duty to warn or protect against third party criminal act will be imposed." *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 136 n.3 (2018). Thus, "assum[ing] without deciding that a special relationship exists, the question becomes whether, as a matter of law, under the facts and circumstances of this case, the [church defendants] had a duty to warn [A.H.] about the potential for third party criminal acts." *Peterson*, 286 Va. at 357. "Certain special relationships . . . impose a duty to warn when the danger of third party criminal acts is known or reasonably foreseeable" while other relationships impose "a duty to warn of third party criminal acts only where there was 'an imminent probability of injury' from a third party act." *Id.* Even where the Court has recognized a duty to protect against criminal acts that are known or reasonably foreseeable, this Court has "frequently concluded that the duty to warn was not present as a matter of law." *Id.* at 358.[3]

---

[3] Indeed, when applying the "known or reasonably foreseeable" standard, "[i]n only rare circumstances has this Court determined that the duty to protect against harm from third party criminal acts exists." *Id.* at 359. *See, e.g., Taboada v. Daly Seven, Inc.*, 271 Va. 313, 325-326

34

"Here, even if this Court were to apply the less stringent standard of 'know or have reasonably foreseen,' there simply are not sufficient facts from which this Court could conclude that the duty to protect [A.H.] against third party criminal acts arose as a matter of law." *Id.* at 359. The amended complaint alleges that A.H. was sexually abused by Billups in his home between 2006 and 2010. According to the allegations, it was reasonably foreseeable to the church defendants that Billups would sexually abuse A.H. because "[in] January 2003, a 13 year old victim came forward and disclosed that Don Billups had sexual contact with her in the Summer of 2002" and that "[u]pon information and belief, prior to Defendant Donald Billups'[s] abuse of plaintiff A.H.," the church defendants "became aware of" the 2003 allegation through "a criminal and/or social services investigation."

Thus, while the amended complaint alleges the church defendants knew of the 2003 allegation, it does not allege any facts regarding this allegation, whether this allegation was verified, how the investigation into this allegation was resolved, or what the church defendants knew of the resolution of this investigation. In other words, if plaintiff proves at trial the allegations made in the amended complaint, plaintiff will prove only that the church defendants knew that an allegation against Billups was made by an unidentified minor, concerning an alleged incident that was committed in an undefined manner, at an unknown location, under unknown circumstances, and that the alleged incident was investigated by social services and/or law enforcement who took no action against Billups. Therefore, it cannot be said that the sexual abuse of A.H. was known or reasonably foreseeable to the church defendants. *See, e.g., Peterson*, 286 Va. at 359, (holding that "[b]ased on the limited information available to the Commonwealth [regarding the shooting in a dormitory earlier in the morning], it cannot

---

(2006) (holding that allegations were sufficient to survive demurrer where hotel employees called police 96 times over a three year period immediately prior to attack to report criminally assaultive acts and hotel had received warning from police that guests were at a specific and imminent risk of harm).

be said that it was known or reasonably foreseeable that students in [another building on campus] would fall victim to criminal harm").[4]

Accordingly, assuming without deciding that a potential duty to protect A.H. arose from a special custodial relationship between A.H. and the church defendants, I would hold that the sexual abuse of A.H. by Billups was not known or reasonably foreseeable by the church defendants as a matter of law.

As a result, I concur in part and dissent in part from the Court's disposition of this appeal.

---

[4] The majority acknowledges that "the amended complaint does not assert any specifics about the allegation or how, if at all, any social services or law enforcement authorities resolved it," and includes only a "vague description" absent "any assertion that the responsible authorities had verified it." For these reasons, the majority holds that the 2003 allegation is insufficient to support a claim that the church defendants were negligent "in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm [others]," *Southeast Apts. Mgmt., Inc. v. Jackman*, 257 Va. 256, 260-61 (1999). Yet, the majority concludes that the 2003 allegation is sufficient to show that it was known or reasonably foreseeable to the church defendants that Billups would harm A.H., so as to impose a duty upon the church defendants to protect A.H. from Billups. The majority reasons that the 2003 allegation gave rise to a duty to protect A.H. because "the church defendants did nothing" to protect her, including taking "no action against Donald Billups to report such allegations to legal authorities." The contention that a duty to protect A.H. was imposed upon the church defendants because they did not protect her is a non sequitur, is circular reasoning, and does not address the relevant inquiry, which is whether there are factually plausible averments that it was known to the church defendants, or reasonably foreseeable to them, that Billups would harm A.H.